All persons having business before this honorable court may now draw near and they will be heard. God save the United States and this honorable court. Good morning everyone. Welcome to the first arguments for this court week in the month of May. We are convening our hearings today by video conference and it's a bit of an adventure but I think we're off to a good start. We're only a couple of minutes beyond our scheduled start time and I think we'll be just fine. I hope everyone will remain patient as we work through the details of our new reality here for a little while. Mr. Morrison. Yes your honor. Please proceed. Thank you your honor. Members of the court good morning. My name is Stephen Morrison and I represent the appellant Jovan Harris. First I just want to thank this court and especially the administrators for setting this up. It's a pretty complex thing. As I said I represent Mr. Harris and I just want to say that when I was growing up my parents would always tell me that I am known by the company I keep and that in the real world guilt by association is real. But the Supreme Court has always fortunately gone a different route and has been skeptical of conspiracy charges going back before Kodiakos when the association is not the basis for criminal liability but you have to have a connection a true meeting of the minds aiming towards one common criminal goal. And this case of course is a conspiracy case and flowing from that conspiracy are distribution charges and death and bodily injury charges. And what I would ask this court to do which I'm sure this court will do is treat each of these charges individually and don't look simply at association or co-physical presence between Mr. Harris and these other folks that were active in Fargo at the same time and really dig into whether there was actually a connection a criminal meeting of the minds for the conspiracy and as far as the distribution charges and the distribution causing death and serious bodily injury charges go whether there was actually sufficient evidence. And of course we know that the sufficiency of the evidence charge or the sufficiency of the evidence standard is not whether there is any evidence to support the jury's verdict but whether there is enough evidence that would allow the jury to act without hesitation in the most important of their affairs. That's a very high standard even on appeal even on an insufficiency of the evidence argument. So I'm happy to take your Honor's questions as we go along but I'll just start diving into each of these individual counts starting with the conspiracy. Now let's assume that my client Mr. Harris truly did come from Milwaukee to Fargo to distribute heroin. Let's assume that for the purposes of this appeal there's simply not enough evidence that there was a criminal meeting of the minds between Mr. Harris and anybody else. Now Mr. Morrison, excuse me, this is Judge Smith. What about the testimony of Masters and McIntosh who seemed to indicate that they were purchasing and selling these narcotics with the assistance of the defendant? You've got Masters, you've got McIntosh. I can address that. I can also address Gretch and Smith. But as for Masters and McIntosh, if anything, they were victims of Mr. Harris's activities if indeed he did come to Fargo to distribute heroin. Their apartment was received heroin from Mr. Harris and distributed some of it. But their overriding interest in this was feeding their own addictions. And that's not a meeting of the minds. Mr. Harris, if he had any criminal intent, was to distribute heroin for profit. Morgan Masters and Tyler McIntosh wanted to feed their own addictions. And in the government's opening statement, the government points directly to that when the government indicates that virtually all of these witnesses against Harris are going to be drug addicts themselves. And in its opening, the government called these people, quote, co-conspirators, if you want to call them that, or customers. Do you consider Jacob Wetsch in the same light? Absolutely, your honor. Jacob Wetsch got heroin to use and to sell a little. And as we know, buy-sell relationships aren't enough. And simply because a dealer's customer passes some of that product on to somebody else doesn't make for a conspiracy. Because again, you have to have that meeting of the minds. If I go to my local grocery store and buy ten packages of blueberries because I love them so much, and I come home and give five to my neighbor because I know he loves them so much, and he turns around and decides, you know what, I want to break even on this, so I'm going to give two to my next neighbor. Well, that doesn't mean that my neighbor and I have a conspiracy to distribute blueberries. That's simply a buy-sell relationship. And as far as Mr. Smith goes, who is, I suppose, the other possible co-conspirator here, Smith couldn't even identify heroin in court as his heroin source. There's simply no sufficient evidence of a conspiracy here. Moving on, if I may, to the other charges, the distribution causing the death of J.W.L. and the court is fine with that. I'm going to use the initials because that's what was used primarily in the district court. The focus of J.W.'s death in evidence was this gas station in Fargo. You had a law enforcement agent testifying to the details of that transaction, but there was absolutely nothing on the video. There was no transaction indicated. My client was not on the video. J.W.L. was not on the video. There appeared to be a Chrysler 300 on the video, and I think it was a blue Taurus, if memory serves, but there was no indication of any Wisconsin or Illinois license plate. Added to that is the fact that whatever happened at Stay Mart happened 13 to 18 hours prior to J.W.L.'s death, and those 13 to 18 hours are unaccounted for, and J.W.L. was a known heroin user and dealer. He easily could have gotten the deadly heroin from some other source. There's just no but for causation proven when it comes to the death of J.W.L. As far as the two counts of distribution causing the injury on one count of McIntosh, TPM, and on one count of Masters, MSM, ultimately the evidence that Harris was the source of that was MSM testifying that she was, quote, pretty sure that the heroin she overdosed on, quote, probably came from Harris. That certainly doesn't sound like proof beyond a reasonable doubt to me. That language is full of doubt. Then finally, we've got the two distribution charges on March 21st and March 22nd. The evidence of these distribution charges emerged based on a control buy in which Mr. Ramirez was used as the CI or the plant, I guess, if you want to call him that. He was wired up and there was a recording. On these recordings, Ramirez dealt with TPM. He testified he made the deals with TPM. The recordings don't reveal anything criminal on Harris' part. In court, Ramirez was unable to clearly identify Harris as this poo character who was in the apartment. Indeed, Ramirez admitted he lied to police when he told them he made the deal with poo. Was Harris in that apartment? Certainly was. Was Harris the source of the heroin? It's absolutely not clear that he was. Once again, I just want to refer to the test for insufficiency of the evidence. It's not whether there's any evidence. It's whether a jury should be willing to rely without hesitation in the most important of their affairs. The evidence here simply places Harris in Fargo around a bunch of other people who are addicts and buyers and sellers of heroin and tries to call that a conspiracy and tries to show that Harris was the source of heroin that caused injuries and deaths. It's a lot of tragedy when it comes to the heroin trade, but there's just no evidence that Harris was the source. I have one question, Mr. Morrison. It's often the case that a supplier of heroin will be supplying the drug or meth or whatever the drug might be to somebody who is both a user and a seller. They're a seller many times the support they're having. If the evidence supports or the jury could reasonably find that Harris was selling to a bunch of users who were also sellers, why does that not make a conspiracy? Because the criminal intent is different. There's no meeting of the minds in terms of the criminal goal. Isn't the goal to sell heroin? I would disagree with your honor. The goal for Harris, arguably, is to sell heroin. And the goal for folks like Masters and Wedge and McIntosh is to get heroin to use. And the secondary activity in support of that original criminal goal may or may not be to sell a portion of that heroin, but we're talking about two separate criminal mens rea. One, distribute heroin. Two, use heroin and do what you have to to support that habit. Two different criminal intents mean that there's no conspiracy. And I realize that when we're talking about an insufficiency of the evidence argument, as to a conspiracy, I face an uphill battle. But I think if this court looks in detail at each of these counts, the court will see that there was, in fact, insufficient evidence. Unless the court has additional questions, I would reserve the balance of my time for rebuttal. Thank you, Mr. Morris. Thank you. Ms. Healy? Good morning. May it please the court, my name is Megan Healy and I represent the United States in this matter. The United States respectfully asks this court to affirm Javon Harris' on all counts of conviction. More than sufficient, indeed, as to certain counts overwhelming evidence supporting each conviction. I intend to spend my time this morning responding to counsel's arguments and I will dedicate most of my time to counts one and two. Unless the court has counts on the remainder, we'll rest on those counts. With respect to the conspiracy count, I think it's helpful, given counsel's arguments, to review some baseline principles of conspiracy law, A conspiracy requires an element or an agreement to distribute heroin, voluntary and intentional joining of the conspiracy, and that the defendant knew the purpose of the conspiracy. That this agreement need not be explicit, it may be inferred from the facts and circumstances. Indeed, proof of a common plan or a tacit understanding is sufficient. The United States need not prove an identifiable organizational structure a loosely-made non-hierarchical collective person engaged in a series of transactions involving distribution quantities in a particular area over a period of time is sufficient. Indeed, evidence as in this case, primarily a testimony from a conspirator, does not reveal as to a conspiracy. Ms. Healy? Yes, sir? We're having a little problem with your audio. Could you make sure your mic is... You might want to get your mic a little closer and make sure it's not obstructed with anything. And while I have your attention, would you focus specifically on what is the government's proof of agreement between Mr. Harris and the alleged co-conspirators? Certainly, Your Honor. Is this better as to the audio? Yes. All right. Focusing on the agreement, again, it can be proof of a common plan or a tacit understanding. Here are the facts that support an agreement. Multiple witnesses testified that they procured heroin from Mr. Harris for resale as well as personal use. Jacob Lynch testified as to procuring multiple deals a day in the summer of 2015 of distributional quantities of heroin. He testified two to ten deals a day. Ms. Masters and Mr. McIntosh also testified that they received heroin on either a daily or every other day basis in the summer of 2015, some of which they then redistributed. Alexis Fenters testified that Jordan Larry procured heroin for her from Mr. Harris. She did not know the source. I want to be clear about that. On a near daily basis. Multiple other witnesses testified that Jordan Larry's source at the time was Mr. Harris. And Ms. Fenters' description of his source, which she saw only a single time, was consistent with that of Mr. Harris. So that proves that a number of people were buying from Mr. Harris. But what's the proof that there was an agreement for the heroin sold by him, or the drugs sold by Harris, to be redistributed? Your Honor, when drugs are sold to an individual in distribution quantities, that is proof of a common understanding, a common plan, and tacit agreement for conspiracy law. Is there any dispute about the drug quantities involved here? Jacob Walsh testified as to the quantities that he was receiving at the time, up to a couple of eight bottles at a time. And that is consistent, as the testimony of Kyle showed, with distribution quantities of heroin. And the frequency of his deal, up to ten times a day, is consistent with redistribution of heroin. Moreover, when Mr. Harris left Fargo after the overdose death of Jordan Larry, and after the overdose resulting in serious bodily injury of Ms. Fenters and Mr. McIntosh, he arranged for his distribution network in Fargo to continue to receive heroin through another source that he then supplied, Mr. Smith, who is known as P or Peace. Mr. Smith testified that to get heroin, he would call Harris by cell phone, and then different women would bring the drugs to him for redistribution. He redistributed those to, among others, Jacob Walsh. As to the argument that everyone in a conspiracy needs to have precisely the same understanding for there to be a meeting of the mind, this court has concluded to the opposite. I'll point this court to the Lewis case from 2018. It is cited in our brief. The site is 895 Bedford, 1004. The same argument was raised in that case, that one conspirator wanted to sell heroin for profit, and another conspirator had no intention of paying for that heroin. And this court rejected the argument that there was no agreement, that there was no meeting of the mind, because they shared the common plan, which was to distribute heroin, which was the charged offense. The same is true in this case. There's ample evidence of a common plan and a common agreement to commit the charged offense, which is distribution of heroin. That results in a sufficient agreement to sustain the conspiracy conviction. A number of these witnesses also corroborated each other, which bolstered their testimony, this corroboration as to the location and their interactions with Mr. Harris. All of this goes to a finding that there was an agreement to distribute heroin, and Harris was a principal supplier for this distribution network in the Fargo area over the course of many months in 2015 and 2016. Mr. Morrison, along with Zane, discussed that this was merely a buyer-seller relationship. And this court, and also in support of the court's Conway decision from 2014, rejected that in a similar case, where this court held that there was evidence of multiple drug transactions as opposed to a single isolated sale,  significant quantities of drugs, and significant interactions between dealers and users over an extended period of time, a buyer-seller theory is not appropriate. I also note that this was not the defense raised at trial. No instructions on this theory were requested, and this court is reviewing any buyer-seller defense at this point for plain error. And it's also important to note that facts here show ongoing heroin transactions or resales with multiple individuals over many months in the Fargo area. I must return to count two. In my brief on pages 38-41, I detail at some length the multiple corroborative pieces of evidence that, taken together, are more than sufficient for the reasonable inference that Mr. Harris distributed the heroin on which Jordan Larry overdosed and later died. I'll point to multiple calls and texts between Jordan Larry and Mr. Harris leading up to the meet-up at Stamart late in the afternoon before Jordan Larry died. Mr. Larry texted mid-senters saying he was with his favorite heroin source at the time of the meet-up. The video footage from Stamart shows a silver Chrysler 300 with an out-of-state license plate in close proximity to a blue car. Multiple witnesses believe Mr. Harris and the silver Chrysler 300 was out-of-state plates in the summer of 2015, including a law enforcement witness who conducted a traffic stop. A law enforcement witness testified that Mr. Speaker had told him that Jordan Larry was with Mr. Speaker in the blue car at Stamart. Multiple individuals at that time identified Harris as Jordan Larry's source, including Ms. Masters, Mr. McIntosh, Mr. Wetsch, and mid-senters testified that Jordan Larry sold her heroin shortly after the Stamart meet-up. Taken together, this supports a reasonable inference that Jordan Larry met his heroin source at Stamart and procured heroin on which he later overdosed. Now, Mr. Morrison and I feel, and at trial, Mr. Kohler advanced the theory that he could have gotten heroin from someone else after he left the Dairy Queen the night before or after distributing heroin to two mis-senters. First, this theory was rejected by the jury, and it does not change the fact that the record contains sufficient evidence to support the jury's conclusion that Mr. Harris distributed the heroin on which Jordan Larry overdosed, causing his death. To find otherwise would conflict this court's long-standing legal principle that although the evidence must be consistent with guilt, it may not be inconsistent with every other reasonable hypothesis. The jury rejected the argument at trial, concluding that all the corroborative pieces of evidence taken together supported the reasonable inference that Mr. Harris distributed the heroin on which Mr. Larry overdosed and died. The court does not have further questions for me. I will rest on my brief as to the remainder of the count. I would like to note briefly that there is also a motion to correct the record pending before this court along with the merits, and I would ask the court to deny that motion as a matter of law. Mr. Harris has failed to sustain his burden to overcome the statutory presumption that the certified trial transcript prepared by a court-employed court reporter is an accurate, complete record of the trial proceedings. There was a couple of motions and a couple of different responses on this point, and this court is in the position to make that assessment and to deny that motion as a matter of law at this point. Other courts of appeals have concluded that, and I'm quoting, a bald assertion of error is insufficient to overcome the statutory presumption that the transcript is correct. This is a Fourth Circuit case from 2003, United States v. Hill. I will note that it is an unpublished case. I will provide this citation to the court in a 28-day letter. Mr. Harris has provided no evidence in support of his position, much less any evidence that would overcome the statutory presumption that the certified transcript filed in this case was a correct statement of the testimony taken. If the court has no more questions for me, I will arrest and respectfully ask that the court affirm each count of conviction in this case. Thank you. I do have a question about that last point you just made, Ms. Healy. Do you know, does the court reporter keep a tape recording of the trial, or is it just his or her notes? My understanding, and the lead trial counsel briefed this issue for the court, but my understanding for speaking with him is that the court reporter here does not take an audio recording along with her stenographic notes as she is recording proceedings in the court. And in this case, it would be difficult to remand to the district court since Judge Bennett is no longer a judge and has retired. It would be. Yes, Your Honor, that's a practical consideration. We have the legal consideration that I argued, the practical consideration that you know. And also, when you really dig into it and get down to the brass tacks, it's our position that none of the alleged inaccuracies would undermine the evidence supporting each conviction. The errors alleged include generalized statements that pages of the transcripts have been re-scripted without explaining how, and suggested assertions of newly scripted testimony that are uniformly self-serving. Even if you accepted these alleged inaccuracies as true, the jury would have heard the evidence, as Ms. Nicara says, it existed and nevertheless convicted. And none of these go to the heart of the sufficiency of the evidence for each of the convictions. And for all of these reasons, the United States believes it's appropriate for this court to deny that motion as a matter of law. Thank you very much. Thank you, Ms. Gideon. Mr. Morrison, you are revoked. Thank you, Chief Judge. I'm not anxious to get into my client's issue regarding correction of the record, but Judge Malloy, to respond to you, I did have a communication with the clerk in July of 2019. There are no audio recordings of the trial. She uses a transcription software from Stenograph Incorporated, so there is no audio recording. I just want to respond to a few things that Ms. Healy said. Ms. Healy suggested that the video at Stamart shows the Chrysler having out-of-state plates that was close to the blue Taurus. A law enforcement agent testified to that, but I would invite this court to review that video. The video unequivocally does not show any out-of-state plate, and it does not show the Chrysler close to the blue Taurus. Second, Ms. Healy referred to Pete or Mr. Smith as carrying on Harris' supposed conspiracy after Harris left Fargo. Smith testified, however, that he didn't do any heroin deals with Harris, didn't know where his heroin was coming from, didn't know if the person he was calling to obtain heroin was the defendant, and could not identify Harris in court as the person he was speaking to about obtaining heroin. And then two final points more generalized. One, Ms. Healy absolutely accurately describes the current state of the law around conspiracy, but it's a tragedy that the current state of the law focuses so much on what the government does not have to prove. But that's backwards. When the government is charging somebody, the government should be required to positively prove a connection. It shouldn't be that the government can rely on not having an explicit agreement, not having this type of evidence or that type of evidence. And I recognize that this negative approach to proving conspiracy is typical in the Eighth Circuit and other circuits, but it's backwards. The government should have to prove something positive. And finally, Ms. Healy accurately gave a rendition of the evidence regarding Harris distributing heroin to these other folks, but a simple criminal connection doesn't make a conspiracy. If Harris were a gun seller and sold a gun to a customer he knew would rob a bank, that does not mean that Harris was in a conspiracy to rob a bank. It might mean Harris is responsible for some other crime, but not a conspiracy to rob a bank. And I see that my time has elapsed, and I will rest on that and ask that you vacate all six of Mr. Harris' convictions. Thank you. Thank you, Mr. Morrison. Court wishes to thank both counsel for appearing before us today in this interesting forum and environment. We appreciate the briefing that you've submitted. We will take the case under advisement. And Mr. Morrison, I note that you are serving today under the Criminal Justice Act, and the court wishes to thank you for your willingness to provide that service to the government and specifically to Mr. Harris. Thank you. The court will take the case and the motion under advisement and will render decision in due course. Thank you. Thank you.